UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

MIGUEL CONCEPCION,

                                        Plaintiff,

        vs.

                                                                9:08-CV-1278
DR. ROBERT PICKLES, Physician, Oneida                           (FJS/ATB)
Correctional Facility; SUSAN CONNELL,
Superintendent, Oneida Correctional Facility,

                                        Defendants.

_____

MIGUEL CONCEPCION, Plaintiff *Pro Se*
ADRIENNE J. KERWIN, Asst. Attorney General for Defendants

ANDREW T. BAXTER, United States Magistrate Judge

## REPORT-RECOMMENDATION

        This matter has been referred to the undersigned for Report and

Recommendation by the Honorable Norman A. Mordue, Chief United States District

Judge pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

        Plaintiff alleges in his complaint that defendants denied him constitutionally

adequate medical care for more than two years while Plaintiff was an inmate in the

custody of the Department of Correctional Services ("DOCS") at Oneida Correctional

Facility ("Oneida").  (Compl. ¶ 11, Pl. Resp. Decl. 1.)  In the jurisdictional section of

the complaint, Plaintiff cites, in addition to 42 U.S.C. § 1983, 42 U.S.C. sections 1331

and 1343).[1]  (Compl.  ¶ 1.)  Counts I and II are based on violations of the Eighth

_____

        [1] Although Plaintiff cites these sections as appearing in Title 42 of the United States
Code, he is clearly attempting to cite the jurisdictional sections in Title 28.  28 U.S.C. §§ 1331
(federal question), 1343 (civil rights).

Amendment and Count III is based on a violation of the Universal Declaration of Human Rights.[2]  (Compl. ¶¶ 16-21.)  Plaintiff states that he seeks declaratory relief, injunctive relief enjoining defendants from retaliation for bringing this action, $3,000,000.00 in compensatory damages from each defendant, and $6,000,000.00 in punitive damages from each defendant.  (Compl. 6–7; Pl. Mem. of Law in Opp. 2.)

Presently before this court is defendants' motion for summary judgment pursuant to FED. R. CIV. P. 56.  (Dkt. No. 11.)  Plaintiff has responded in opposition to the motion with a memorandum of law, an affidavit, a declaration, and a statement pursuant to Local Rule 7.1(a).  (Dkt. No. 13.)  For the following reasons, this court recommends granting defendants' motion for summary judgment.

## DISCUSSION

### I.   Facts

Plaintiff has been in the custody of DOCS since 1996, and apparently tested positive for the human immunodeficiency virus ("HIV") before his arrest in 1995, a fact he made known upon his confinement at Riker's Island.  (Compl. ¶ 6; *see also*

---

[2] Plaintiff alleges that the Unites States is a "signatory" to the Universal Declaration of Human Rights ("UDHR"), G.A. Res. 217(III)A, U.N. Doc. A/810 (1948).  (Compl. ¶ 21.)  The UDHR is not a treaty with signatories, but rather a declaration adopted by the United Nations General Assembly on December 10, 1948.  The UDHR does not impose obligations under international law, but is rather a "statement of principles . . . setting up a common standard of achievement for all peoples and all nations."  *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 734 (citing Humphrey, the UN Charter and the Universal Declaration of Human Rights, in The International Protection of Human Rights 39, 50 (E. Luard ed. 1967) (quoting Eleanor Roosevelt).  Treaties that are not self-executing do not provide independent, privately enforceable rights.  *See Guaylupo-Moya v. Gonzales*, 423 F.3d 121, 133 (2d Cir. 2005).  Additionally, a separate analysis of Plaintiff's claims under the UDHR is not necessary, because the provision of the UDHR cited by Plaintiff is in all relevant respects identical to the 8th Amendment of the U.S. Constitution.

Def. Mem. of Law 1.)  After Plaintiff's initial confinement at Riker's Island, he was then transferred to Downstate Correctional Facility,  Sing Sing Correctional Facility, Eastern Correctional Facility, and Franklin Correctional Facility before being transferred to Oneida Correctional Facility ("Oneida").  (Compl. ¶¶ 6, 8, 9.)  Plaintiff alleges that he received specific medications to treat his HIV at each of the correctional facilities where he was incarcerated before he arrived at Oneida.  (Compl. ¶¶ 9–10.)  Attached to the complaint is a "Medication Order Sheet" from Riker's Island, dated June 4, 1996, indicating a prescription for AZT[3] 200 mg for 60 days.[4] (Compl. 10.)  Also attached is a "Medical History" form dated June 26, 1996, that indicates a prescription for AZT 100 mg.  (Compl. 17.)

Other Ambulatory Health Records ("AHRs") attached to the complaint for the same time period (June 25, 1996) indicate a prescription for AZT 200 mg.  (Compl. 21.)  However, Plaintiff also attached an AHR dated July 11, 1996, that states "HIV +, $CD_4$ 710,  no meds." (Compl. 19.)  Additionally, Plaintiff attached a "Health Screening Form" with dates, beginning July 10, 1996 and ending on May 25, 1997. (Compl. 13.)  The form indicates that Plaintiff is HIV-positive, but fails to indicate any specific medical treatment for HIV.  *Id*.  Another "Health Screening Form"

---

[3] Zidovudine (AZT) is commmonly prescribed for treatment of HIV (*See* http://www3.niaid.nih.gov/topics/HIVAIDS/understanding/treatment/AZTandAIDS.htm).

[4] Plaintiff did not label all of the attached documents as exhibits, but filed them as one document at Dkt. No. 1.  The complaint comprises the first 7 pages and the attached documents follow, with most of them lacking any kind of identifying letter or number.  The court will refer to the attached documents by page number beginning with page 8 immediately following page 7 of the complaint if there is no identifying letter or number.  Otherwise, the court will refer to the identification used by Plaintiff.

without a date immediately follows, and indicates a prescription for AZT 200 mg. (Compl. 14.)  Plaintiff attaches no documentation for the period between 1998 and 2006.

Plaintiff alleges that after he arrived at Oneida in 2004, defendant Dr. Robert Pickles failed to provide the same medication Plaintiff had been prescribed when he was previously housed at different correctional facilities, "despite knowing [P]laintiff's condition."  (Compl. ¶¶ 11–13.)  Plaintiff filed a grievance dated December 29, 2006, which was considered by the Inmate Grievance Review Committee ("IGRC"), then was appealed to the Superintendent (Defendant Connell), and the Central Office Review Committee ("CORC").  (Compl. 25-26; Pl. Mem. of Law Ex. A-1, A-2; Defs. Ex. B-9, B-10.)  Plaintiff exhausted all administrative remedies before filing his complaint.  (Compl. ¶ 5; Compl. Ex. A, C.)

Plaintiff further alleges that defendant Robert Pickles refused to give Plaintiff medication for his HIV because Dr. Pickles "believed it was not needed, and was costly to the state."  (Compl. ¶ 13.)  Plaintiff concludes that defendants "interfered and disrupted" and "continued to withhold" Plaintiff's medication therapy in deliberate indifference to his medical condition, causing him to suffer "severe joint pain, lesions to the body, weight loss, impaired vision, and skin discoloration, etc."  (Compl. ¶¶ 12, 13, 17.)  Plaintiff finally alleges that he did not receive his "previously prescribed medication until the New York State Commission on [sic] Correction investigated plaintiff's claim."  (Pl. Mem. of Law 10.)  Plaintiff received a response from the State Commission of Correction indicating that they had reviewed his medical record and

determined that he was being "followed by Infectious Disease as well as [his] primary physician."  (Pl. Mem. of Law Ex. C.)

Plaintiff's complaint alleges that both defendants showed deliberate indifference to Plaintiff's medical needs by refusing to treat him with the same medications he had been taking before he arrived at Oneida.  Defendants have moved for summary judgment based on three arguments: they argue that Dr. Pickles was not deliberately indifferent to Plaintiff's serious medical needs, Plaintiff has failed to allege any personal involvement on the part of Superintendent Connell, and both defendants are entitled to qualified immunity.  Defendants also argue that to the extent Plaintiff seeks to sue them in their official capacities, the complaint should be dismissed.

## II.   Summary Judgment

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact.  FED. R. CIV. P. 56; *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990) (citations omitted).  "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion."  *Id*.  However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

In meeting its burden, the party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying the

portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-movant bears the burden of proof at trial, the moving party may show that he is entitled to summary judgment by either (1) pointing to evidence that negates the non-movant's claims or (2) identifying those portions of the non-movant's evidence that demonstrate the absence of a genuine issue of material fact. *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006) (citing *Celotex Corp.*, 477 U.S. at 23). The second method requires identifying evidentiary insufficiency, not merely denying the opponent's pleadings. *Id.*

If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id.* A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Additionally, while a court "'is not required to consider what the parties fail to point out,'" the court may in its discretion opt to conduct "an assiduous view of the record" even where a party fails to respond to the moving party's statement of material facts. *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (citations omitted).

Plaintiff in this case has responded to defendants' motion. (Dkt. No. 13).

However, the court will still carefully review the entire record in making its determination.

**III.   Eleventh Amendment**

It is well-settled that the state cannot be sued in an action based on section 1983. *Komlosi v. New York State OMRDD*, 64 F.3d 810, 815 (2d Cir. 1995) (citing *Will v. Michigan Department of Police*, 491 U.S. 58, 71 (1989)).  This holds true whether the court is considering Eleventh Amendment immunity or a statutory interpretation of section 1983.  *Id*. at 815 n.3.  An action against state officers in their official capacities is tantamount to an action against the state.  *Yorktown Medical Laboratory, Inc. v. Perales*, 948 F.2d 84, 87, 88 n.1 (2d Cir. 1991) (citations omitted).

Plaintiff's complaint indicates that the defendants are being sued in both their individual and official capacities.  Defendants correctly argue that, to the extent they are being sued in their official capacities for money damages, those causes of action should be dismissed under the Eleventh Amendment.  *Huang v. Johnson*, 251 F.3d 65, 69-70 (2d Cir. 2001); *Posr v. Court Officer Shield #207*, 180 F.3d 409, 414 (2d Cir. 1999).  Plaintiff's response memorandum of law cites *Santiago v. N.Y. State Dept. of Corr. Serv.* for the proposition that sovereign immunity bars suits against state employees when acting in their official capacities.  *See* 945 F.2d 25, 28 n.1 (2d Cir. 1991).  Thus, to the extent the complaint alleges claims for damages against the defendants in their official capacities, the court recommends dismissal of those claims, and will analyze the complaint assuming it makes claims against both defendants in their individual capacities.

7

## IV.    Personal Involvement

Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability.  *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citation omitted); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003).  In *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.

A supervisory official is personally involved if that official directly participated in the infraction.  *Id.*  The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong.  *Id.*  Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue.  *Id.*  Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event.  *Id.  See also Iqbal v. Hasty*, 490 F.3d 143, 152–53 (2d Cir. 2007) (citing *Colon v. Coughlin*, 58 F.3d 865, 873) (2d Cir. 1995)), *rev'd on other grounds*, 129 S. Ct. 1937 (U.S. 2009).

Defendants argue that Ms. Connell is not a medical professional and is therefore not qualified to make medical decisions.  (Defs. Mem. of Law 5.)  Plaintiff's grievance brought to Superintendent Connell's attention Plaintiff's complaints regarding the medical care he was receiving at Oneida.  However, Plaintiff fails to establish any

issue of fact about whether Superintendent Connell's review was anything other than a finding that Plaintiff's medical problems were being addressed by the medical staff at Oneida according to their professional judgment.  Even automatic and complete deference by prison officials to decisions made by medical professionals is not, by itself, sufficient to establish deliberate indifference.  *See Brock v. Wright*, 315 F.3d 158, 164 (2d Cir. 2003).  Furthermore, Superintendent Connell's review of Plaintiff's grievance was signed on March 5, 2007, almost three months after Plaintiff had begun treatment with medications for his HIV at Oneida.[5]  (Compl. Ex. C).

Plaintiff claims that Superintendent Connell "personally reviewed Plaintiff's grievance, and denied him the requested relief." (Pl. Mem. of Law Ex. A-2). However, the only relief requested in his grievance was that he receive "respectful medical attention, treatment . . . a written explanation why it took more than two (2) years for me to be given medication for my medical problem.  And that my medical situation not be disclosed . . . ."  *Id.*  The IGRC response indicates that the members verified that Plaintiff was "receiving treatment for his medical concerns" and that he is "entitled to a professional, & confidential environment." (Defs. Ex. B-15). Superintendent Connell upheld the IGRC's findings and directed Plaintiff to address further medical concerns during sick call.  *Id*.

There are some cases supporting the proposition that if a supervisory official acts *personally* in denying a grievance, she may be sufficiently involved if she fails to

---

[5] Oddly, Plaintiff did not file his grievance until *after* he began receiving the requested drug therapy. (Def. Ex. B-9, Grievance dated 12/29/06).

remedy the situation. *See Atkinson v. Selsky*, No. 03 Civ. 7759, 2004 U.S. Dist. LEXIS 20560, *2–4; 2004 WL 2319186, *1–2 (S.D.N.Y. Oct. 15, 2004).  In this case, however, by the time Superintendent Connell reviewed Plaintiff's grievance appeal, the situation had already been remedied, and there was no further action that Superintendent Connell could take.  She could not have been personally responsible for any prior alleged constitutional violation of which she was not aware.  Plaintiff has failed to establish any issue of fact establishing Superintendent Connell's personal involvement.  Accordingly, this court recommends that summary judgment be granted on behalf of Superintendent Connell.

## V.   Medical Care

In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  There are two elements to the deliberate indifference standard. *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003).  The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (*citing* inter alia *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

### A.  Objective Element

In order to meet the objective requirement, the alleged deprivation of adequate medical care must be "sufficiently serious." *Salahuddin v. Goord*, 467 F.3d 263, 279

(2d Cir. 2006) (*citing Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Determining whether a deprivation is sufficiently serious also involves two inquiries. *Id.* The first question is whether the plaintiff was actually deprived of adequate medical care. *Id.* Prison officials who act "reasonably" in response to the inmates health risk will not be found liable under the Eighth Amendment because the official's duty is only to provide "reasonable care." *Id.* (*citing Farmer*, 511 U.S. at 844–47).

The second part of the objective test asks whether the inadequacy in the medical care is "sufficiently serious." *Id.* at 280. The court must examine how the care was inadequate and what harm the inadequacy caused or will likely cause the plaintiff. *Id.* (*citing Helling v. McKinney*, 509 U.S. 25, 32–33 (1993)). If the "unreasonable care" consists of a failure to provide any treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Id.* (*citing Smith v. Carpenter*, 316 F.3d 178, 185–86 (2d Cir. 2003)). However, where the alleged inadequacy is in the medical treatment that was actually afforded to the inmate, the inquiry is narrower. *Id.* If the plaintiff is receiving ongoing treatment, and the issue is an unreasonable delay or interruption of the treatment, then the "seriousness" inquiry focuses on the challenged delay itself, rather than on the underlying condition alone. *Id.* (*citing Smith*, 316 F.3d at 185). Thus, the court in *Salahuddin* made clear that although courts speak of a "serious medical condition" as the basis for an Eighth Amendment claim, the seriousness of the condition is only one factor in determining whether the deprivation of adequate medical care is sufficiently serious to establish constitutional liability. *Id.* at 280.

### B.  Subjective Element

The second element is subjective and asks whether the official acted with "a sufficiently culpable state of mind." *Salahuddin* 467 F.3d at 280. (*citing Wilson v. Seiter*, 501 U.S. 294, 300 (1991)).  In order to meet the second element, plaintiff must demonstrate more than a "negligent" failure to provide adequate medical care. *Id.* (*citing Farmer*, 511 U.S. at 835–37).  Instead, plaintiff must show that the defendant was "deliberately indifferent" to that serious medical condition. *Id.*  Deliberate indifference is equivalent to subjective recklessness. *Id.* (*citing Farmer*, 511 U.S. at 839–40).

In order to rise to the level of deliberate indifference, the defendant must have known of and disregarded an excessive risk to the inmate's health or safety. *Id.* (*citing Chance*, 143 F.3d at 702).  The defendant must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he or she must draw that inference. *Chance*, 143 F.3d at 702 (*quoting Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).  The defendant must be subjectively aware that his or her conduct creates the risk, however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer*, 511 U.S. at 844.  Thus, the court stated in *Salahuddin*, that the defendant's believe that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." 467 F.3d at 28.

Additionally, a plaintiff's disagreement with prescribed treatment does not rise

12

to the level of a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001). Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Id.* (citations omitted). An inmate does not have the right to treatment of his choice. *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986). The fact that plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation. *Id.*

Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. *Sonds*, 151 F. Supp. 2d at 312 (*citing Estelle*, 429 U.S. at 107). Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Id. See also Daniels v. Williams*, 474 U.S. 327, 332 (1986) (negligence not actionable under Section 1983). Thus, any claims of malpractice, or disagreement with treatment are not actionable under Section 1983.

## C. Application

No one disputes that HIV itself is a "serious medical condition." Plaintiff argues that because he failed to receive medications for his HIV when he arrived at Oneida, he was deprived of adequate medical care. It is clear from the evidence that, at worst, there was only an "interruption" in the medication Plaintiff had apparently been given sometime in the past. Thus, the question becomes whether the interruption

claimed by Plaintiff is "sufficiently serious."[6]  A review of all the evidence shows that even assuming that any interruption of Plaintiff's medication could have been "sufficiently serious,"[7] Plaintiff cannot establish the subjective prong of the standard. He cannot establish that defendants were deliberately indifferent to his serious medical needs.

The court would first note that although Plaintiff seems to imply that the medication that he wanted had been prescribed all along during his incarceration, that is clearly not the case.  His claim is inconsistent with the medical records.  The medical records that Plaintiff attached to the complaint show that a decision to *discontinue* the AZT was made on June 28, 1996 while he was incarcerated at Downstate Correctional Facility.  (Compl. 20.)  In the AHR for June 28, 1996, under the section "Meds Ordered," the first entry states: "D/C AZT, 3TC"[8]  The rest of the AHR for June 28, 1996, indicates that Plaintiff was complaining of a headache (H/A); that his blood pressure was 152/88; and that his "$CD_4$" level was 710.  *Id.*  On July 11, 1996, under the heading "HIV+", the AHR states "$CD_4$ 710 no meds."  *Id.* at 19.

It appears from these documents that the AZT as well as another medication

---

[6] The court also notes that Plaintiff did not arrive at Oneida until 2004, thus, the only "delay" or interruption for which these defendants would be responsible would be from 2004 until 2006.

[7] The court will analyze the two prongs together because the reason for the interruption in Plaintiff's treatment is linked to Plaintiff's condition and is directly related to the doctor's medical judgment.

[8] 3TC is another name for Lamivudine, used to treat HIV. www.nlm.nih.gov/medlineplus/ druginfo/meds/a696011.html#other-names.

used in HIV cases were discontinued in June of 1996 because Plaintiff's $CD_4$[9] count was at a certain level.  Plaintiff has included no documents indicating prescriptions for AZT after June 28, 1996.  Thus, Plaintiff was not given AZT *continuously* throughout his incarceration.  (*See* Compl. 13 (reception nursing sheet for three facilities, dated July 10, 1996; February 28, 1997; and May 27, 1997).)  None of these entries indicate that Plaintiff was receiving AZT at that time.  He apparently received medication some time in 2001, but for less than one year.  (Def. Ex. D-13-14.)  Plaintiff's allegations directly contradict his medical records, but this alone does not create a factual dispute. *See Benitez v. Pecenco*, 92 Civ. 7670, 1995 U.S. Dist. LEXIS 10431 at note 5; 1995 WL 444352 (S.D.N.Y. July 27, 1995) (*citing Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) (explaining that conclusory allegations that conflict with medical records are alone insufficient to create a factual dispute).

The records show that medical personnel at Oneida were aware of Plaintiff's HIV upon his arrival and closely monitored his condition.  The dates of blood test results establish that the staff immediately ordered blood work.  Plaintiff's AHR entry dated August 17, 2004, when he first arrived at Oneida, states "HIV+ >10 years" and lists Plaintiff's other medical problems. (Defs. Ex. D-121.)  The AHR includes a list of medications.  *Id.*  The list does *not* include AZT.  *Id*.

On September 1, 2004, a Medlabs report that included an "Immune Def. Panel"

---

[9] A $CD_4$ test is used to help evaluate and track the progression of HIV infection and disease. www.labtestsonline.org/understanding/analytes/cd4/test.html.  According to public health guidelines, preventative therapy should be started when an HIV positive person who has no symptoms registers a $CD_4$ count under 200 cells per cubic millimeter of blood.  *Id.*

was completed.  (Defs. Ex. D-82.)  It appears from that report that the medical personnel were focusing on the value of "T Helper % (CD4)," because the number reported in the "Count" column (469) has a box drawn around it.  *Id*.  Plaintiff's AHR dated October 1, 2004, states "HIV under good control." (Defs. Ex. D-118.)   Medical personnel continued to monitor Plaintiff's $CD_4$ level, as indicated by a subsequent report dated December 2, 2004, which has the number "37.0" in the $CD_4$ "Percent" column circled and the number "557" in the "Count" column underlined.  (Defs. Ex. D-79.)  The word "better" is written at the bottom of the laboratory report with an arrow pointing to the circled number in the $CD_4$ "percent" column.  *Id*.  Another AHR entry dated March 14, 2005, notes "Seen re HIV.  Stable."  (Defs. Ex. D-109.) Medical staff were actively monitoring Plaintiff's $CD_4$ level, as further evidenced by a "Request and Report of Consultation" dated June 21, 2005, which states "HIV+ – monitor $CD_4$ count, viral load . . . ."  (Defs. Ex. D-12.)

One year later, a "Request and Report of Consultation" dated April 6, 2006, states "HIV infection clinically stable . . . ."  (Defs. Ex. D-13.)  The Medlabs report one month later, dated May 25, 2006, again has the number in the $CD_4$ "Count" column circled.  (Defs. Ex. D-46.)  The same number is underlined in the BioReference Laboratories report dated September 16, 2006. (Defs. Ex. D-29.)  In addition to the repeated blood tests, Plaintiff was seen by various consulting physicians.  On April 6, 2006, Dr. Pickles referred Plaintiff to Dr. Waleed Albert to

determine whether to re-start the "HAART."[10]   (Def. Ex. D-13.)  The April 6, 2006

report indicates that Plaintiff had taken medication in *2001* for less than one year, and

that the infection was "clinically stable."  *Id.*

In a consultant report, dated July 20, 2006, Dr. James Bramley wrote that

Plaintiff refused to be seen by 'telemed" and refused to discuss lab results.  (Def. Ex.

D-16.)  Another appointment was to be scheduled.  *Id.*  On November 16, 2006, Dr.

Pickles sent Plaintiff to another consultant.  (Defs. Ex. D-14.)  The doctor's notes state

that Plaintiff was on HAART for "1 year."  *Id*.  The report also states that Plaintiff had

been "stable off HAART," and that it would be possible to treat Plaintiff without

HAART until his $CD_4$ count was less than 350, and his viral load had increased.  *Id.*

However, the Plaintiff wanted to start the medication immediately.  The consultant

outlined two options in his report.  *Id.*  The first option was to continue to monitor

Plaintiff without the drug therapy until his $CD_4$ count dropped below 350 and then

begin drug therapy.  The second option was to begin the drug therapy immediately.

Plaintiff's doctors decided to start the medication, and Plaintiff began his treatment in

December of 2006.[11]  *Id*.  Clearly, the choice was a *medical judgment*.

Plaintiff may have disagreed with Dr. Pickles about what kind of treatment

Plaintiff should have received for his HIV.  Dr. Pickles made medical judgments that

Plaintiff may have disliked, but these judgments do not rise to the level of a

---

[10] HAART stands for highly active antiretroviral therapy. www3.niaid.nih.gov/topics/
HIVAIDS/Understanding/.

[11] The court would also point out that in December of 2006, Plaintiff's $CD_4$ count
dropped to its lowest value of 297.  (Def. Ex. D-85 (AHR entry dated 12/18/06).)

constitutional violation.  At the very worst, they may be considered negligent, but as

discussed above, negligence and malpractice alone do not violate the Eighth

Amendment.  The court notes that it is clear that Plaintiff's therapy was discontinued

at other times during his incarceration, and that he was not receiving medication when

he arrived at Oneida.  (Def. Ex. D-121 (AHR entry of Aug. 17, 2004).)  When

Plaintiff's values reached the point where the doctor believed that medication was

necessary, Plaintiff obtained his medication.  (*See* Def. Ex. D-32, 85 (AHR entry dated

12/18/06).)

In this case, there is no evidence in the record to contradict Dr. Pickles' medical

decision.  Plaintiff has failed to establish any indication that any medical professional

disagreed with Dr. Pickles' medical decisions relating to Plaintiff's HIV.  Nothing in

the record indicates any "willful blindness"[12] by Dr. Pickles.  It is also clear that Dr.

Pickles sent Plaintiff to various consultants to obtain their opinions about Plaintiff's

care.  As shown above, these consultants all followed the same treatment regimen, that

of monitoring Plaintiff's $CD_4$ levels and not beginning HAART until Plaintiff's $CD_4$

levels decreased to a certain level.  Plaintiff has failed to establish an issue of fact

regarding both the subjective and objective elements of his claim of deliberate

indifference.  Accordingly, this court recommends granting summary judgment as to

---

[12] The facts in this case are easily distinguishable from those in *Johnson v. Wright*, 412
F.3d 398 (2d Cir. 2005).  In *Johnson*, the Second Circuit denied summary judgment where a
chief medical officer overruled all treating physicians based on prison policies without review of
the relevant medical records.  412 F.3d at 404–05.  *Salahuddin* likewise distinguished *Johnson*,
describing the chief medical officer's actions as "willful blindness," which requires that someone
arouse the defendant's suspicion that a particular course of medical treatment would be seriously
harmful.  467 F.3d at 282 (distinguishing *Johnson*, 412 F.3d at 404–05).

Plaintiff's deliberate indifference claims.

## VI.   **Qualified Immunity**

Defendants argue that they are entitled to qualified immunity, which protects government officials when performing their discretionary functions when "their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).  Defendants here did not violate a constitutional right, so the court need not address qualified immunity.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 11) be **GRANTED**, and the complaint be **DISMISSED IN ITS ENTIRETY.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: February 12, 2010

**Hon. Andrew T. Baxter**
**U.S.  Magistrate Judge**

19